AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
By: STEPHEN CHA-KIM
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2768
Fax: (212) 637-2702
E-mail: stephen.cha-kim@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VILLAGE OF AIRMONT,<br><br>Defendant. | No. 20 Civ. 10121<br><br>**COMPLAINT** |

Plaintiff the United States of America, upon information and belief, alleges for its complaint as follows:

**BACKGROUND**

1. From its inception as an independent municipality three decades ago, the Village of Airmont ("Airmont" or the "Village") has been tainted by discriminatory animus against Orthodox Jews. As found by a jury and affirmed by the Second Circuit, Airmont's incorporation in 1991 was motivated by the desire of certain leaders to impose unlawful zoning restrictions in order to thwart the ability of their Orthodox Jewish neighbors to worship at home in accordance with their religious beliefs.

2. Rather than striving to overcome this legacy, the Village chose to double down on discriminatory zoning in the decades that followed, seeking to curtail not only residential

religious worship by Orthodox Jewish residents but also the operation of religious boarding schools. As a result, Airmont has spent a significant portion of its 29-year history under investigation by the Department of Justice, in litigation, and subject to judicially ordered oversight.

3. Unfortunately, the Village has returned to its old ways in recent years. No longer subject to any direct oversight after 2015, when the terms of a court-entered consent decree expired, Airmont has once again unlawfully interfered with the rights of Orthodox Jewish community members to freely exercise their religion. The Village has done so by adopting a new zoning code that eliminated residential places of worship as a by-right use, in violation of the terms of a final judgment entered by a court in this District; applying the provisions of the new code in a discriminatory manner to make it impossible for Orthodox Jewish applicants to win zoning approval of home synagogues and a school; implementing an 18-month Village-wide moratorium on development which ultimately had no legitimate governmental purpose and was instead used to prevent Orthodox Jewish community members from advancing their religious land-use applications; and arbitrarily enforcing and interpreting local laws to prevent Orthodox Jews from using their privately owned property in ways consistent with their faith, such as prohibiting homeowners from clearing trees to construct sukkahs, ritual huts required under Orthodox Jewish beliefs, or to install mikvahs, ritual baths necessary for religious observance.

4. The Village's current zoning code and its actions violate the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA"). Accordingly, the United States brings this suit to enforce the provisions of RLUIPA and to

vindicate the rights of Airmont's Orthodox Jewish residents to make use of their land to practice their religion free of any undue burden.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 42 U.S.C. § 2000cc-2(f) and 28 U.S.C. §§ 1331, 1345.

6. Pursuant to 42 U.S.C. § 2000cc-2(f), the United States is authorized to commence suit against a local government for injunctive or declaratory relief to enforce compliance with RLUIPA.

7. Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims in this action occurred in this district.

## PARTIES

8. Plaintiff is the United States of America.

9. Defendant the Village of Airmont is a municipality located in Rockland County, New York, and is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## FACTUAL ALLEGATIONS

### Airmont's History of Discrimination

10. The Village of Airmont came into existence through the efforts of an organization called the Airmont Civic Association ("ACA"), which in 1991 successfully mobilized residents to incorporate as a separate municipality out of the Town of Ramapo. The

ACA mobilized in this manner because Ramapo had recently amended its zoning code to allow for home synagogues, or residential places of worship for Orthodox Jews.[1]

11. Religious animus motivated the drive to incorporate. Reacting to the rising numbers of Orthodox Jews settling in the area and dissatisfied with the lack of desired responsive action by Ramapo, the ACA openly and successfully stoked fears of a "grim Hasidic belt" and exhorted the virtues of "keeping the Hasidim out" in forming the Village and enacting a restrictive zoning code.

12. The United States sued Airmont shortly after its incorporation for violating the federal Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 417-19 (2d Cir. 1995) ("*Airmont I*"). As a jury unanimously found, in a finding the Second Circuit upheld, the ACA, whose members had become the Village's first mayor, trustees, and Zoning Board members, had engaged in a conspiracy to deprive Orthodox Jewish residents of their civil rights, in part by making it impossible under the new zoning code to co-locate home synagogues in their residences, an important element of their religious practice. As a member of the ACA boasted in no uncertain terms, "the only reason we formed this village is to keep those Jews . . . out of here."

13. As a result of this first round of litigation, at the direction of the Second Circuit, final judgment was entered against the Village requiring Airmont, *inter alia*, to recognize a category of "residential place of worship" in its zoning code, defined as an "area located within

---

[1] Orthodox Jewish religious law prohibits the use of automobiles, or any other form of powered vehicle, on the Sabbath and all major Jewish holidays. Accordingly, Orthodox Jews must live within walking distance of synagogues, also called shuls. Residential places of worship fulfill this religious need.

a residence that is used for the conducting of religious services" and was to "be permitted by right on any day in all residential zones." *See United States v. Vill. of Airmont*, 925 F. Supp. 160, 161 (S.D.N.Y. 1996). The injunction also required the Village to notify the United States of any proposed changes to its zoning code for a period of five years.

14. In 1999, Airmont attempted an end-run around the injunction, by seeking to enact a zoning amendment that would have arbitrarily limited the size of any residential places of worship and subsequently, rather than requesting approval of the United States, filing an improper collateral challenge seeking relief from the injunction from a different judge. That collateral challenge was dismissed. *See Vill. of Airmont v. United States*, No. 98 CIV. 3801 (CM), 1999 WL 123384 (S.D.N.Y. Feb. 5, 1999). The United States never consented to the Village's proposed changes to its zoning code.

15. In 2005, the United States once again sued Airmont, this time under RLUIPA as well as the Fair Housing Act, alleging that the Village's zoning code unlawfully prohibited the operation of Hasidic religious boarding schools, despite allowing other types of land use with similar residential components. *See United States v. Vill. of Airmont*, No. 05 Civ. 5520 (LAK) (S.D.N.Y. June 10, 2005) ("*Airmont II*").

16. That case was resolved by entry of a consent decree in 2011, under which Airmont was prohibited from imposing burdens on religious exercise and land use, was required to notify the Government of all applications for land use for religious purposes and of any proposed or enacted amendments to the zoning code, and paid a civil penalty.

17. The *Airmont II* consent decree expired in 2015.

“Preserve Airmont” and the Village’s Continuing Anti-Hasidic Agenda

18. Airmont is governed by an elected five-member Board of Trustees (“Board”), composed of the mayor and four trustees. The mayor is responsible for running Village services. The Board is the legislative branch of local government and has responsibility for establishing local laws and ordinances, including its zoning code.

19. Airmont’s Planning Board is responsible for reviewing all site plans and subdivision applications in the Village.

20. Airmont’s Zoning Board of Appeals hears all requests for variances from the Airmont Zoning Code as well as requests for special permits under those regulations.

21. In the run-up to the 2015 Village election, a new political organization called “Preserve Airmont” was formed, whose rhetoric and goals were a direct descendant of the ACA and its anti-Orthodox Jewish agenda.

22. Preserve Airmont’s members refrained, at least initially, from the overtly hostile language of the ACA, but the common agenda was clear. Preserve Airmont campaigned by attacking the “things the way they are done in the Town of Ramapo,” whose zoning changes to accommodate Orthodox Jews were what originally spurred Airmont to incorporate in the first place. Preserve Airmont’s campaign flyer openly stated: “Didn’t we form a Village to separate from the practices and financial irresponsibility of the Town of Ramapo?”

23. In 2015, Preserve Airmont’s candidates won the election, installing Philip Gigante as mayor and a slate of Village Trustees, and establishing a majority on the Board.

24. In one advertisement during the 2017 Village Trustee elections, Mayor Gigante appealed to anti-Hasidic sentiment, arguing in favor of stopping Orthodox Jewish development and stating that the Village “doesn’t want to become the next Town of Ramapo.” In another ad,

Preserve Airmont attacked opponents for having favorable ties with Orthodox Jewish community members: the advertisement shows candidates opposed to Preserve Airmont's agenda receiving awards from a Hasidic congregation against the backdrop of an atomic mushroom cloud, while ominous music is heard and the words "Let's play connect the dots" flashes on the screen.

25. One 2017 Preserve Airmont candidate for Village Trustee displayed outright hostility in a long post about Orthodox Jews moving into the area, writing: "This is our problem. It's not enough that these communities choose to make certain lifestyle choices . . . they will not live side by side with others."

26. Preserve Airmont won the 2017 elections, preserving its majority on the Village Board.

27. One example of Mayor Gigante's animus towards Orthodox Jews occurred when on the eve of Yom Kippur in September 2017, he sent the Village's fire inspector to the home of his neighbors, an Orthodox Jewish family, to demand that the family take down the sukkah in its front yard. The sukkah violated no law or regulation and the family was within its rights to have it placed on the yard in accordance with Jewish religious practices. The fire inspector, at the mayor's direction, threatened the family with immediate eviction unless the sukkah was taken down. Frightened by the threat, the family took down the sukkah.

28. Although Mayor Gigante lost his seat in 2019 after being removed from the ballot by a New York State court, Preserve Airmont continues to have a majority of seats on the Village's Board of Trustees.

In 2007, the Village Amends its Zoning Code to Make it More Difficult to Develop a House of Worship

29. In December 2007, after the expiration of the reporting requirements in the injunction in place after *Airmont I* but before entry of the consent decree in *Airmont II*—that is, during a period when the Village was not obligated to report proposed changes to the Government—the Village amended its zoning code. The 2007 amendments added requirements that residential places of worship needed to obtain "site approval" or go through the "site review" process, depending on the size of the proposal.

30. The 2007 amendments required that any residential place of worship less than 1,400 square feet obtain "site approval" from the Village's Planning Board, which was required to render a decision within 62 days of submission of an application. Residential places of worship greater than 1,400 square feet would have to go through the Village's "site review" process, which required more onerous procedures, including compliance with several enumerated factors like traffic, circulation, screening, compatibility with neighboring uses, and environmental concerns, among others.

31. Under the 2007 amendments, an application for a site approval was supposed to be reviewed on an expedited basis. A site approval application first went to a building inspector, and then to the Community Design Review Committee ("CDRC"), a body of part-time land use professionals selected by the Village, which included review by the village engineer. If approved by the CDRC, the application was only then referred to the Planning Board for analysis of the same issues.

32. Under the 2007 amendments, once approved by the CDRC, the Planning Board was required to review and render a decision on an application for a site approval within 62 days of receiving the completed application. However, under the 2007 amendments, should either the

CDRC or the Planning Board determine an application for a residential place of worship to be deficient for any reason, they were authorized to provide written notification to the applicant of the basis for the deficiency, along with specific written directions that, if followed by the applicant, would cause such application to become acceptable to the CDRC and/or the Planning Board.

The Village's Moratorium on Development and the 2018 Zoning Code

33. Once in power, the Gigante administration moved to thwart the ability of Airmont's Orthodox Jewish residents to avail themselves of the Village's land use laws, first by delaying and refusing to act on applications for zoning approvals submitted by Orthodox Jewish residents, and then by imposing a blanket moratorium on all development in 2017.

34. The imposition of the moratorium was motivated primarily by a desire to prevent legitimate efforts at land use, including approval of home synagogues, religious schools, and other types of property development, by Orthodox Jews, rather than by any legitimate governmental purpose.

35. After campaigning successfully in the 2017 elections on the moratorium, support or opposition to which was a proxy for whether candidates were sufficiently opposed to increased settlement and development by Orthodox Jews, Mayor Gigante and the Preserve Airmont administration extended the moratorium, which by its own terms was to last six months and could not be renewed, two more times. The hostility and animus underlying Preserve Airmont's agenda was displayed during public meetings, as demonstrated by one speaker's unvarnished explanation: "I believe in the moratorium for the simple reason is that we have to decide who w[e] are as a village and then what we want to be when we grow up and how we want to grow as a village. . . . And to take care some abuses going on that need to be

straightened out. The codes, between the bad Jews and houses of worship and everything like that, I'm going to bang my head against the wall."

36. When the moratorium expired in late 2018, again during a period when the Village had no reporting obligations to the Government after expiration of the *Airmont II* consent decree, the Village implemented a newly amended zoning code (the "2018 Zoning Code") that drastically reworked the land use process in a way that was transparently intended to enable Airmont to further delay and effectively kill zoning applications by Orthodox Jewish community members.

37. The 2018 Zoning Code remains in effect to date.

38. The 2018 Zoning Code struck "residential place of worship" as a recognized category, replacing it with regulation of a new catchall category, "residential places of assembly," defined as a residence where "likeminded people conduct civic, social, or religious activities."

39. The 2018 Zoning Code removed the 2007 "site approval" procedures in their entirety and, instead, turned all residential religious use into "a special permit use subject to site plan review pursuant to §210-73" of the Village Code. Removal of recognition of a standalone category of residential place of worship violated the terms of the final judgment entered in *Airmont I*, which mandated that the Village maintain that specific category in its zoning code. Now, under the 2018 Zoning Code, Village residents seeking to have any residential place of worship may not do so unless they obtain a "special permit use," requiring full site plan review, under the provisions for a residential place of assembly.

40. The 2018 Zoning Code imposes a new limitation that the area of assembled worship at a residential place of assembly "shall not exceed the [sic] 40% of the gross floor area

of a residence." The 2018 Zoning Code further limits the area where religious use may occur by including all accessory facilities in the calculation of what counts toward religious use: "This calculation includes places where associated activities are carried out such as bathrooms, meeting rooms, lobby areas and/or other accessory facilities used primarily in conjunction with the residential place of assembly."

41. The 40-percent limitation is wholly arbitrary and is not based on any legitimate zoning consideration. Moreover, because the 2018 Zoning Code defines the relevant floor area to include any place "where associated activities are carried out," including bathrooms and other common areas, the arbitrary 40-percent limitation is easily triggered by residents seeking to incorporate a synagogue for communal worship into their homes.

42. The 2018 Zoning Code also makes it unlawful for "non-members" to utilize space in any residential place of assembly and for any "accessory use" space in a residence to be used for any meetings or functions for which the space is not authorized by the Village. These restrictions further infringe on religious exercise in that they ostensibly prohibit "non-members" from worshiping alongside "members." For example, this prohibition on "non-members" could prohibit family, friends and visitors from worshiping alongside "members".

43. The 2018 Zoning Code also banned "public baths," resulting in the banning of mikvahs, or small baths used by some Orthodox Jews in religious rituals. This prohibition was instituted for the purpose of interfering with the Orthodox Jewish community members' ability to carry out religious practices for which mikvahs are necessary.

44. The 2018 Zoning Code also did not include a grandfather provision for applications that were pending at the time of the moratorium on development. All such

applications were subjected to the new procedural and substantive requirements put in place by the 2018 amendments.

The Village's Discriminatory Application of Zoning and Land Use Provisions

45. Whereas, prior to 2018, residential place of worship applications, such as for home synagogues, were required to be resolved by final decision within 62 days of submission of a completed application, the 2018 Zoning Code requires only that a public hearing be held by the Planning Board within 62 days after an application is deemed "completed." Moreover, the authority to deem an application "completed" is vested entirely within the CDRC.

46. The 2018 Zoning Code does not outline any meaningful or clear standards that the CDRC is to apply in its review of whether an application is sufficiently complete. Yet the CDRC has unfettered discretion to require those applicants it wishes to single out to attend an unlimited number of meetings at which the CDRC may, with little to no explanation, identify supposed problems with submitted materials and/or require, with no little to no advance notice, additional submissions that must be made for review at a future meeting. The CDRC has used this discretion to stymie Orthodox Jewish applicants from developing small residential houses of worship. The supposed problems that the CDRC has identified in this manner include minor clerical errors in paperwork as well as purported issues with aspects of a land use application that the CDRC conspicuously failed to raise in previous meetings, further unnecessarily delaying the process.

47. CDRC meetings occur only once a month and applicants are required to pay significant sums for each meeting to compensate the CDRC members for their time. The CDRC also routinely requires certain applicants to submit an unnecessary and excessive amount of physical copies of application materials, including expensive architectural renderings, often

demanding such copies on the day of the meeting or at a time that does not allow applicants to comply before a scheduled meeting. As a result, applicants singled out by the CDRC can easily rack up tens of thousands of dollars in expenses in an endless "Kafkaesque" cycle that never results in an application being deemed "completed," and therefore never subject to final review by the Planning Board (and the 62-day deadline for the Planning Board to even hold a public hearing).

48. CDRC meetings are also open to the public. Community members who are hostile to land use applications made by Orthodox Jews have attended in large numbers in a show of force. Due to poor planning, Village officials often cancel public meetings at the last minute due to overcrowding, furthering delaying applications from being considered.

49. Although the CDRC is a separate body from the Planning Board and Zoning Board, CDRC members work in close coordination with the mayor, members of the Zoning and Planning Boards, and other Airmont officials, making their decisions about individual applications in consultation with the Village.

50. The CDRC process as described above has been applied in an arbitrary and discriminatory fashion and to delay and prevent completion of land use applications by Orthodox Jewish community members.

51. For example, after initiating the approval process in March 2016 for an extension to his home to enable more room in which his immediate family and congregation can pray, one rabbi still has not received approval from the Village, over four years later. Another rabbi, in an effort to accommodate members of the growing Orthodox community requesting to pray with him in his home, has been attempting to obtain the necessary approvals to operate a home synagogue, without success, since late 2015. Yet another congregation has been stymied in its

similar efforts since at least 2012. Each of these individuals and groups has accumulated tens of thousands of dollars in relevant expenses.

52. In each of these cases and in others, the Village has successfully used the imposition of the moratorium on development and, after passage of the 2018 Zoning Code amendments, the arbitrary operation of the CDRC to obstruct legitimate and lawful land use projects by Orthodox Jewish residents. In some cases, Village officials have also used the threat and actual imposition of fines for supposed violations of the Village zoning code to further thwart and intimidate applicants.[2]

53. In another example, the Village has unlawfully and without basis prevented the approval of a land use application by an Orthodox Jewish congregation to expand a religious school located in Airmont, which was first submitted in 2016. Besides subjecting the applicants to numerous fruitless CDRC meetings, the Village also used the pretext of a violation of occupancy limitations at the school, including affirmatively issuing a notice of violation, to deny providing necessary approvals for the expansion of the school. The notice of violation is entirely pretextual, as the Village knew about and tolerated the operation of the predecessor school on the same site without pursuing any such purported violation. As a result of the Village's unlawful failure to act on the application for expansion of the school, the congregation has been forced to operate the school in a series of overcrowded, makeshift trailer-like annexes.[3]

---

[2] The Village's actions with respect to some of these individuals are the subject of a separate pending lawsuit brought by private litigants in this District, to which this action should be deemed related. *See Congregation of Ridnik* et al. *v. Village of Airmont* et al., No. 18-cv-11533 (NSR).

[3] The Village's actions with respect to the application for expansion of the school are the subject of a separate pending lawsuit in this District, to which this action should also be deemed related. *See Central UTA of Monsey* et al. *v. Village of Airmont* et al., No. 18-cv-11103 (VB).

54. Finally, in another example of Airmont's discriminatory application of the 2018 Zoning Code and other land use regulations, the Village has been denying applications made by Orthodox Jews for permits to clear trees on their property, to the extent necessary in order to create space for sukkahs. Orthodox Jewish religious precepts require that those inside a sukkah have a clear line of sight of the sky. In denying these permits, Village officials acted out of hostility towards the expression of Orthodox Jewish religious practice and had no legitimate purpose in delaying or denying the applications. Village officials have been routinely granting similar applications for tree clearing made by non-Orthodox Jewish residents.

55. Under the 2018 Zoning Code, there are no zoning districts in Airmont in which houses of worship, including residential houses of worship, are allowed as of right. Anyone seeking to develop a new house of worship in Airmont must go through, at a minimum, the Village's special permit process, the CDRC, and its concomitant byzantine labyrinth of permits, hearings, approvals, and fees.

56. The 2018 Zoning Code is a land use regulation within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(5).

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Substantial Burden Claim: Violation of 42 U.S.C. § 2000cc(a)(1)

57. Paragraphs 1 through 56 are re-alleged and incorporated herein by reference.

58. The relevant portions of the 2018 Zoning Code and its implementation are a system of land use regulations involving the individualized assessment and review of proposed property uses.

59. Airmont's Orthodox Jewish community members have a reasonable expectation to use real property, including private residences and land owned to operate an existing school, for religious purposes, including worship at home and the expansion of a religious school.

60. The Village's actions, including but not limited to, imposing the moratorium on development, adopting the 2018 Zoning Code, and implementing its procedural and substantive provisions in an arbitrary and discriminatory manner, have thwarted the Orthodox Jewish community members' reasonable expectation that they could use real property for religious purposes and caused them to suffer delay, uncertainty, and expense with regard to their intended use of real property.

61. The 2018 Zoning Code does not further a compelling governmental interest, or even if it does, it is not the least restrictive means of furthering any compelling governmental interest.

62. The Village of Airmont has substantially burdened and continues to substantially burden the Orthodox Jewish community's religious exercise.

**SECOND CLAIM**
**Discrimination Claim: Violation of 42 U.S.C. § 2000cc(b)(2)**

63. Paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

64. The 2018 Zoning Code is a land use regulation and law that discriminates on its face against the religious practices of Orthodox Jews in Airmont.

65. In the alternative, to the extent that the 2018 Zoning Code can be considered a facially neutral law, it was adopted and applied to have a discriminatory effect on Airmont's Orthodox Jews.

66. At all relevant times, the Village of Airmont and relevant officials acted intentionally out of discriminatory animus in imposing and implementing the 2018 Zoning Code.

67. The Village of Airmont and relevant officials have applied the 2018 Zoning Code in a discriminatory fashion against Orthodox Jewish residents.

68. The Village of Airmont therefore has discriminated and continues to discriminate on the basis of religion or religious denomination in violation of RLUIPA.

**THIRD CLAIM**
**Unreasonable Limitations Claim: Violation of 42 U.S.C. § 2000cc(b)(3)(B)**

69. Paragraphs 1 through 68 are re-alleged and incorporated herein by reference.

70. The 2018 Zoning Code is a land use regulation and law that broadly limits where Orthodox Jews in Airmont may practice their religion, including by unreasonably limiting or preventing the use and construction of religious assemblies, institutions, or structures on real property.

71. The 2018 Zoning Code therefore places unreasonable limitations on the religious assemblies, institutions, and structures, and the practices of Airmont's Orthodox Jewish residents in violation of RLUIPA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States of America respectfully requests that the Court enter judgment that:

(a) declares that the Village of Airmont's Zoning Code, and its arbitrary and discriminatory actions in implementing, enforcing, and applying its provisions, violate RLUIPA;

(b) enjoins the Village of Airmont, its officers, employees, agents, successors, and

all other persons in concert or participation with them, from imposing or implementing a land use regulation in a manner that imposes a substantial burden on the exercise of religion;

(c) enjoins the Village of Airmont, its officers, employees, agents, successors, and all other persons in concert or participation with them, from imposing or implementing a land use regulation that discriminates against religious assemblies or institutions;

(d) enjoins the Village of Airmont, its officers, employees, agents, successors, and all other persons in concert or participation with them, from imposing or implementing a land use regulation in a manner that unreasonably limits religious assemblies or institutions;

(e) enjoins the Village of Airmont, its officers, employees, agents, successors, and all other persons in concert or participation with them, from adopting, implementing, or enforcing any zoning law, ordinance, code, or restriction in a manner that otherwise violates RLUIPA; and

(f) grants such other and further relief as the Court may deem just, together with the United States of America's costs and disbursements in this action.

Dated: December 2, 2020
New York, New York

WILLIAM P. BARR
Attorney General

By: /s/
ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By: ______________________
STEPHEN CHA-KIM
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2768
Fax: (212) 637-2702
E-mail: stephen.cha-kim@usdoj.gov