UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      Plaintiff,

  -v-

      No. 20 Civ. 10121 (NSR)

VILLAGE OF AIRMONT,

      Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
THE UNITED STATES OF AMERICA'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

AUDREY STRAUSS
United States Attorney
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2768
Facsimile: (212) 637-2702

STEPHEN CHA-KIM
Assistant United States Attorney
 – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    Airmont Incorporates Out of Animus Toward Orthodox Jews, Is Ordered to Permit RPWs By Right Following Jury Verdict Affirmed by the Second Circuit ...............2

    B.    Airmont Tries Unsuccessfully to Amend Its Code Unilaterally, Agrees to Adjudicate a Single RPW Application Under Proposed Process as a "Test Case" ......5

    C.    Airmont Successively Erodes RPW Rights When Not Under Judicial Oversight .......7

        1.    The 2007 Zoning Code ............................................................................7

        2.    The 2011 Consent Decree .......................................................................8

        3.    "Preserve Airmont" and the Moratorium on Development ..........................9

        4.    The 2018 Zoning Code ..........................................................................10

        5.    Effect on Orthodox Jewish Residents ....................................................12

ARGUMENT ...............................................................................................................13

I.    Applicable Preliminary Injunction Standard .................................................13

II.    RLUIPA Requires Entry of a Preliminary Injunction .......................................14

    A.    The Government Is Likely To Succeed on the Merits .....................................14

        1.    Airmont Has Substantially Burdened Residents' Religious Exercise ...........14

            a.    The Village Categorically Restricts Certain Religious Exercise and Imposes RPWs to Arbitrary Delay, Uncertainty, and Expense ..................15

            b.    The Challenged Provisions and Conduct Are Not the Least Restrictive Means to Further Legitimate Government Interests ...........................20

        2.    Airmont Discriminates on the Basis of Religion ....................................22

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agudath Israel of America v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) ................................................................... 25

*Bethel World Outreach Ministries v. Montgomery County Council*,
    706 F.3d 548 (4th Cir. 2013) ................................................................. 21

*Bikur Cholim, Inc. v. Village of Suffern*,
    664 F. Supp. 2d 267 (S.D.N.Y. 2009) .................................................... 20

*Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic Dist. Com'n*,
    768 F.3d 183 (2d Cir. 2014) ............................................................ passim

*Christian Fellowship Centers*,
    377 F. Supp. 3d 146 (N.D.N.Y. 2019) ................................................... 25

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    597 F.3d 115 (2d Cir. 2010) ............................................................ 13, 14

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
    138 F. Supp. 3d 352 (S.D.N.Y. 2015) ............................................... 21, 22

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ............................................................................... 14

*FCC v. Waterbury Hispanic Comm's, Inc.*,
    109 F. Supp. 2d 80 (D. Conn. 1999) ...................................................... 13

*Fifth Ave. Presbyterian Church v. City of New York*,
    293 F.3d 570 (2d Cir. 2002) .................................................................. 20

*Fortress Bible Church v. Feiner*,
    694 F.3d 208 (2d Cir. 2012) ................................................. 15, 16, 18, 19

*Fortress Bible Church v. Feiner*,
    734 F. Supp. 2d 409 (S.D.N.Y. 2010) .................................................... 15

*Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*,
    456 F.3d 978 (9th Cir. 2006) ........................................................... 16, 19

*Hayden v. Cnty. of Nassau*,
    180 F.3d 42 (2d Cir. 1999) .................................................................... 22

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ......................................................................................... 14

*Hsu v. Roslyn Union Free School Dist. No. 3*,
   85 F.3d 839 (2d Cir. 1996) ............................................................................. 16

*Jacobs v. Law Offices of Leonard N. Flamm*,
   No. 04 Civ. 7607 (DC), 2005 WL 1844642 (S.D.N.Y. July 29, 2005) ................. 2, 3

*Kapps v. Wing*,
   404 F.3d 105 (2d Cir. 2005) ............................................................................ 25

*LeBlanc-Sternberg v. Fletcher*,
   67 F.3d 412 (2d Cir. 1995) ............................................................................. 2, 3

*LeBlanc-Sternberg v. Fletcher*,
   922 F. Supp. 959 (S.D.N.Y. 1996) .................................................................... 4

*LeBlanc-Sternberg v. Fletcher*,
   No. 96-6149, 1996 WL 699648 (2d Cir. Dec. 6, 1996) ...................................... 4, 5

*New York Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ........................................................................... 25

*New York v. Dep't of Homeland Sec.*,
   969 F.3d 42 (2d Cir. 2020) ......................................................................... 13, 25

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) .......................................................................... 25

*Redeemed Christian Church of God (Victory Temple) v. Prince George's County*,
   -- F.3d --, 2020 WL 5407808 (D. Md. Sept. 9, 2020) ...................................... 21

*SEC v. Mgmt. Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975) ........................................................................... 13

*Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*,
   396 F.3d 895 (7th Cir. 2005) ...................................................................... 18, 19

*Umar Oriental Rugs, Inc. v. Carlson & Carlson, Inc.*,
   757 F. Supp. 2d 218 (E.D.N.Y. 2010) ............................................................... 2

*United States v. Diapulse Corp.*,
   457 F.2d 25 (2d Cir. 1972) ............................................................................. 13

*United States v. Milner,*
   583 F.3d 1174 (9th Cir. 2009)............................................................ 14

*United States v. Vill. of Airmont,*
   925 F. Supp. 160 (S.D.N.Y. 1996) ............................................. 3, 4, 17

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
   546 U.S. 418 (2006) ............................................................... 20, 21

*Vill. of Airmont v. United States,*
   No. 98-cv-3801 (CM), 1999 WL 123384 (S.D.N.Y. Feb. 5, 1999)..................... 5, 6

*Vill. of Arlington Heights v. Metropolitan Housing Development Corp.,*
   429 U.S. 252 (1977) ...................................................................... 23

*Westchester Day Sch. v. Vill. of Mamaroneck,*
   504 F.3d 338 (2d Cir. 2007)...................................................... passim

*Westchester Day Sch. v. Vill. of Mamaroneck,*
   417 F. Supp. 2d 477 (S.D.N.Y. 2006)................................................ 19

**Statutes**

42 U.S.C. § 2000cc-2 ............................................................................ 1

42 U.S.C. § 2000cc-5(7)(A)................................................................... 15

42 U.S.C. § 2000cc(a)(1) ...................................................................... 14

42 U.S.C. § 12187 ............................................................................... 18

Plaintiff the United States of America (or the "Government"), by its attorney, Audrey Strauss, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for a preliminary injunction under Section 4 of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-2.

## PRELIMINARY STATEMENT

A quarter century ago, the Second Circuit ordered the Village of Airmont to cease using its zoning code to single out and exclude a religious minority. Judgment entered in this District instructed Airmont in no uncertain terms that it must respect the right of its growing Orthodox Jewish community to assemble in religious spaces located within homes, by enshrining such Residential Places of Worship ("RPW") as a land use permitted by right. Despite having spent a significant portion of its history since under judicial scrutiny, including under a RLUIPA consent decree that expired in 2015, the Village once again refuses to recognize the Free Exercise rights of its Hasidic residents.

In brazen disregard of the final judgment to which it is still bound, Airmont amended its zoning code in 2018 not only to strike RPWs altogether, but also to (1) enact restrictions that target key aspects of Hasidic religious exercise—the ability to build a ritual hut on private property during a holiday, to use a ritual bath, to use space in a home for worship as may be necessary, and even to host non-congregants for prayer; and (2) expand the Village's already unlawful practice of utilizing a specialized zoning body, the Community Design Review Committee ("CDRC"), to arbitrarily delay good-faith permit applications, now effectively subjecting every RPW no matter how small in scope to its veto power. Moreover, the record is clear that these actions were motivated specifically by discriminatory intent, a continuation of Airmont's same playbook of open and coded animus towards Hasidic newcomers. Finally, to the

extent that Airmont had any legitimate interests in enacting the 2018 Code, it certainly had less discriminatory and less restrictive regulatory means available to it—first and foremost, implementing in good faith the existing zoning regime, in compliance with the prior judgment.

Accordingly, because the Government is likely to succeed on its claims that Airmont has violated RLUIPA, this Court should preliminarily enjoin the Village from enforcing the unlawful provisions of the 2018 Code pending resolution of this matter.

## BACKGROUND

A.    **Airmont Incorporates Out of Animus Toward Orthodox Jews, Is Ordered to Permit RPWs By Right Following Jury Verdict Affirmed by the Second Circuit**

The Village of Airmont was incorporated in 1991 out of the Town of Ramapo, New York, as a result of the efforts of an organization called the Airmont Civic Association ("ACA"). *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 418 (2d Cir. 1995).[1] As a jury in this District found and the Second Circuit later affirmed in a Fair Housing Act ("FHA") suit brought by private plaintiffs and the United States, the "impetus" behind the ACA's drive for incorporation was "animosity toward Orthodox Jews as a group." *Id*. at 431. Specifically, the ACA was formed in hostile response to permissive zoning steps taken by Ramapo in the 1980s to allow the area's growing Orthodox Jewish community to "conduct worship services within their homes" in conformity with their religious practices. *Id*. at 428. "Strict observance of Orthodox Judaism necessitates a relatively high number of" worship spaces co-located within residences for a number of reasons, including the need for daily prayer and "the presence of a 'minyan'—a quorum of ten males over the age of 13." *Id*. at 417. Because it is "forbidden to use cars or other

---

[1] Under estoppel principles, "previous judgment[s] . . . are public documents subject to judicial notice," and as such any "relevant facts" that have been duly determined "in previous litigation" are deemed "not in dispute." *Umar Oriental Rugs, Inc. v. Carlson & Carlson, Inc.*, 757 F. Supp. 2d 218, 224 (E.D.N.Y. 2010) (citing *Jacobs v. Law Offices of Leonard N. Flamm*, No. 04 Civ. 7607 (DC), 2005 WL 1844642, at *3 (S.D.N.Y. July 29, 2005)).

means of transportation during religious holidays and the weekly Sabbath," adherents must "be able to gather for worship in congregations large enough to ensure the presence of a minyan, and close enough . . . to allow them to walk to services," making home synagogues within neighborhoods vital. *Id*.

Mobilizing against Ramapo's move to accommodate this minority community, the ACA successfully "urged incorporation of the Village expressly in order to gain control of zoning" away from Ramapo, making it clear during public meetings that "the only reason we formed this village is to keep those Jews out of here." *Id*. at 428, 431. The ACA's leaders were elected as the Village's first slate of officials and promptly "adopted a zoning code that was intended to, and would be interpreted to, curtail home synagogues, thereby deterring Orthodox Jews from purchasing homes in many Airmont neighborhoods." *Id*. at 429. As the jury and the Second Circuit both found, there was no "legitimate nondiscriminatory reason" for adoption of the code, as Airmont's professed interests in controlling traffic and noise were deemed pretextual and not credible. *Id*. at 431 (noting "the record is replete with . . . anti-Hasidic animus made or adopted by ACA leaders").

The Second Circuit held that forward-looking injunctive relief was required to "prohibit[ ] the application of the Airmont zoning code in the discriminatory manner found to be predictable from the evidence" adduced at trial. *Id*. at 434. The district court subsequently entered final judgment (the "*Airmont I* judgment") enjoining the Village and its officials from "any conduct having the purpose or effect of perpetuating or promoting religious discrimination" and from any interpretation of its zoning code that would "hinder, prevent, or prohibit persons from assembling in residential dwellings for the purposes of group prayer." *United States v. Vill. of Airmont*, 925 F. Supp. 160, 161 (S.D.N.Y. 1996). The *Airmont I* judgment also required the

Village to include in its zoning code a declaration of purpose that nothing therein "shall be construed or interpreted in any manner whatsoever" to restrict home worship, and mandated that the "[RPW] will be permitted by right on any day in all residential zones," to be defined as "[a]n area located within a residence that is used for the conducting of religious services." *Id.* For a period of five years, Airmont and its officials were also required to notify the Government of any proposed changes to the Village's zoning ordinances relating to religious worship. *Id.* at 162. The judgment finally specified that the Village "may move the Court to terminate this provision of the order" after five years. *Id.*

In its opinion accompanying the judgment, the district court noted that "amending the zoning code" in the specific manner outlined was "the only practical way of complying" with the Second Circuit's instructions to implement a "preventative injunction" that would avoid Airmont's future "use, interpretation, or enforcement of the zoning code in such a manner that it prevents home worship." *LeBlanc-Sternberg v. Fletcher*, 922 F. Supp. 959, 964 (S.D.N.Y. 1996). After the Village appealed the terms of the final judgment, the Second Circuit affirmed that the "prospective" injunction that the district court had entered was a commensurate and appropriate remedy consistent with Supreme Court case law; one that, "[g]iven the Village's history" and the findings at trial that "future violations were likely," was "necessary to guarantee that no constitutional violations occurred in the future." *LeBlanc-Sternberg v. Fletcher*, No. 96-6149, 1996 WL 699648, at *5 (2d Cir. Dec. 6, 1996), *cert. denied*, 117 S. Ct. 2431 (1997).

In 1997, Airmont adopted a zoning code (the "1997 Code") that, in compliance with the *Airmont I* judgment, enshrined the RPW as a recognized zoning category, adopting the exact definition mandated by the district court. *See* 1997 Code, excerpts attached as Ex. 1 to Declaration of Stephen Cha-Kim, Art. XVIII(2). The 1997 Code also expressly listed the RPW

among "[u]ses permitted by right" in applicable residential district categories. *See id*. Art.

III(5.1)(A)(5), (5.2)(A)(5), (5.3)(A)(5), (5.4)(A)(5), (5.5)(A)(5), (5.6)(A)(5).

**B.      Airmont Tries Unsuccessfully to Amend Its Code Unilaterally, Agrees to Adjudicate a Single RPW Application Under Proposed Process as a "Test Case"**

In 1999, Airmont sought to enact amendments to the 1997 Code in order to place new

restrictions on the operation of RPWs, including arbitrarily limiting the area that could be used

within residences for religious purposes to 500 square feet. *See Vill. of Airmont v. United States*,

No. 98-cv-3801 (CM), 1999 WL 123384, at *1 (S.D.N.Y. Feb. 5, 1999). After "the Government,

which—understandably suspicious of the Village's motives—[ ] declined to give its imprimatur"

to these changes, the Village, seeking to evade the terms of the *Airmont I* judgment, commenced

a collateral action before a different district judge in an attempt to obtain leave to proceed

unilaterally with the proposed changes. *Id*. The Court dismissed that action. *Id*. at *2.

Nevertheless, the Government engaged in negotiations with the Village regarding its

desire to adopt a permitting process for RPWs; the Village proposed requiring RPW applicants to

submit "a standard request for issuance of a building permit, together with a proposed plan for

the use and development of the site by the applicant," to "include details regarding water,

sewage, parking, traffic, driveway, fire and emergency, buffering for neighbors, and drainage."

*See* Unsigned Stipulation and Order ("Proposed Zoning Code Stip."), Ex. A to Stipulation and

Order ("Stip. & Order"), attached as Ex. 2 to Cha-Kim Decl., ¶ 1(E). Under the proposal, permit

applications would be considered in one of two ways, an expedited "site review" process for any

proposed RPW under 1,400 square feet and a separate, "site development plan review" process

for any larger RPW. *See id.* ¶ 1(A).

First, upon submission of an application under the smaller category, the Planning Board

was  required to make an "an immediate referral . . . to the CDRC for consideration by the

Village Engineer" of "[i]ssues regarding water, sewage, and drainage . . . to determine if proper engineering standards have been met," while "[i]ssues regarding parking, traffic, access, fire and emergency, and buffering from neighbors" were to be "reviewed by the Planning Board upon recommendation of the CDRC." *Id*. ¶ 1(G). Off-street parking would be required "at the rate of one parking space for every 200 square feet of" the RPW. Proposed Zoning Code Stip. ¶ 1(C). This review process was required to be completed "on an expedited basis," *id*. ¶ 1(G), specifically, "without any public hearing," *id*. ¶ 1(F), and within 62 days of the Planning Board's receipt of the application, *id*. ¶ 1(I).

Second, any RPW exceeding 1,400 square feet would be considered under "regular Planning Board Site Plan review and approval." *Id*. ¶ 1(F); *see also id*. ¶ 1(A) (requiring "site plan approval as set forth elsewhere in this Code"). Thus, these RPWs applications would need to follow procedures set forth in then-existing "Site Development Plan Review" section of the Code. 1997 Code, Art. IX(1). Under these provisions, an applicant had the option of first submitting "an informal plan for discussion" with the Planning Board prior to submitting a formal application for "preliminary site development plan review." *Id*. Art. IX(3)(A)(1). Upon submission of the application, the CDRC had the option to "propose[ ]" a report on the proposal, but in any event the Planning Board was required to conduct preliminary and final review, by holding a public hearing within 62 days, and thereafter "approv[ing] . . . with modifications or deny[ing] the application" within 62 days. *Id*. Art. IX(3)(A)(3), (3)(A)(4), (3)(A)(6), (3)(B)(2). Regardless of size, all RPW applications were to "be given priority in the scheduling of agenda items and hearings and in the rendering of all decisions." Proposed Zoning Code Stip. ¶ 1(L).

The draft stipulation laying out this proposal was not executed; rather, in a separate cover Stipulation and Order that *was* signed and entered by the district court, the Government and the

Village expressly agreed that "before . . . finaliz[ing] the Zoning Code Amendments Stipulation, the parties wish to use" the anticipated RPW application of one Airmont rabbi "as a 'test case' . . . to assess how the proposed changes work in operation," pending "additional negotiation" Stip. & Order, at Final Whereas Clause, ¶ 4; *see also Vill. of Airmont v. United States*, No. 98-cv-3801 (CM), Dkt. No. 31 (entering cover Stip. & Order).[2] The parties "reserve[d] their rights to propose additional modifications" to any proposed amendments to the zoning code "after the processing of" the test case, when "the parties are better positioned to assess" how the proposed provisions "worked in operation." Stip. & Order ¶ 3.

### C.    Airmont Successively Erodes RPW Rights When Not Under Judicial Oversight

### 1.    The 2007 Zoning Code

In 2007, when the Village was no longer required under the *Airmont I* judgment to notify the Government of any proposed zoning amendments, it enacted a new zoning code ("2007 Code"). *See* 2007 Code, excerpts attached as Ex. 3 to Cha-Kim Decl. As in the prior 1997 Code, the 2007 Code included the RPW as a unique land-use category, as defined according to the terms of the *Airmont I* judgment, *see* 2007 Code § 210-174, and expressly listed RPWs among "[u]ses permitted by right" in residential districts, *see id.* §§ 210-14(A)(6), 210-15(A)(6), 210-16(A)(6), 210-17(A)(6), 210-18(A)(6).

The 2007 Code also created a new section called "Residential Places of Worship," that largely tracked the provisions of the Proposed Zoning Code Amendments Stipulation. *See* 2007 Code § 210-12.1(B). However, the 2007 Code specifically omitted the express provision, previously included in the amendment as proposed to the Government in 2000, that applications for RPWs 1,400 square feet or below in size could be considered "without any public hearing."

---

[2] Given the age of this case, a copy of Stipulation and Order as entered is not available on ECF and the Clerk's Office informed counsel for the Government that physical copies were long ago destroyed. Cha-Kim Decl. ¶ 4.

*Compare* Proposed Zoning Code Stip. ¶ 1(F) *with* 2007 Code § 210-12.1(B)(6). Moreover, the

2007 Code made a number of consequential changes to the "site development plan review"

provisions which would now be applicable for proposed RPWs larger than 1,400 square feet. *See*

2007 Code § 210-74. Under the 2007 Code, an applicant still had the option to submit an

informal plan for discussion, but that submission was now to be reviewed by the CDRC. *Id*. §

210-74(A)(1). All formal applications were now also referred to the CDRC to determine "if the

application is complete and whether the site plan complies" with regulatory requirements. *Id*. §

210-74(B)(1). Only upon CDRC approval was a public hearing then required, no later than 62

days after submission of a complete application, to be followed by final adjudication by the

Planning Board within 62 days. *Id*. § 210-74(B)(3),(6). The 2007 Code now mandated that this

review would be governed by requirements outside the Zoning Code, Chapter 164 of the Village

Code, entitled "Site Development Plan Regulations." *Id*. § 210-74(A)(1).[3] These regulations set

forth a long list of substantive and procedural requirements for approval that are commonly

applied by zoning codes to large-scale, significant-impact commercial, industrial, or mixed-use

development. *See* Declaration of Joel Russell ¶ 14.

      **2.**      **The 2011 Consent Decree**

     In 2011, Airmont came under the terms of a consent decree entered by yet another court

in this District, this time to resolve an action that the United States had brought in 2005 under the

FHA and RLUIPA challenging the Village's prohibition of secular and religious educational

institutions with accessory housing. *See* Consent Decree, attached as Ex. 4 to Cha-Kim Decl.;

*United States v. Vill. of Airmont*, No. 05-cv-5520 (LAK), Dkt. No. 53. Airmont paid a civil

penalty and agreed to amend its zoning code and process the application of a Hasidic

---

[3] This Chapter can be found online at https://ecode360.com/6589275 [last visited Feb. 12, 2021].

congregation it had delayed and denied. *See* Consent Decree ¶¶ 11-19, 28. The Consent Decree

further compelled Airmont to comply with the terms of the FHA and RLUIPA, including by

refraining from discriminating on the basis of religion or imposing any substantial burden on

religious exercise unless in furtherance of a "compelling governmental interest" and by the "least

restrictive means." *Id*. ¶¶ 6-10. For a period of four years, as under the *Airmont I* judgment, the

Village was also required to advise the Government of any religious land use applications and of

"all amendments to the Village zoning code that have been proposed to, or approved by, the

Village." *Id*. ¶¶ 5, 24-25.

### 3. "Preserve Airmont" and Moratorium on Development

In the period immediately after the Consent Decree expired, a new political organization

called "Preserve Airmont" won Village elections and, in February 2017, instituted a moratorium

on all development pending consideration of a comprehensive reworking of its zoning code. *See*

Local Law No. 1, attached as Ex. 5 to Cha-Kim Decl. During trustee elections held that year, in

which the moratorium was the dominant issue, Preserve Airmont ran an advertisement in which

Mayor Phillip Gigante stressed that the moratorium was necessary for Airmont to avoid

becoming "the next town of Ramapo." *See* "Moratorium Vote for Web," Mar. 5, 2017, available

at https://www.youtube.com/watch?v=K2LzOmTpcjk [last visited Feb. 12, 2021] ("2017 Ad").

As in the 1990s, invoking Ramapo has remained the byword for evoking fear of Hasidic-driven

development—for instance, one ad from 2019 was widely criticized as anti-Semitic for depicting

images suggesting an "invasion" of Ramapo and Rockland County by Orthodox Jews and

displaying in large text: "a storm is brewing" and "if they win, we lose." *See Uproar Over Anti-*

*Semtitic Video Produced by Republicans in N.Y. County*, N.Y. Times, Aug. 29. 2019, available at

https://www.nytimes.com/2019/08/29/nyregion/rockland-county-gop-video.html [last visited

Feb. 12, 2021] (linking to video) ("Invasion Ad"). Another video circulating online during the moratorium debate showed footage of Preserve Airmont's opponents receiving an award from a Hasidic congregation to a soundtrack of ominous music, with an atomic mushroom cloud and the words "Let's play connect the dots" superimposed on the screen. *See* Affidavit of Yehuda Zorger ¶ 2 & Ex. A ("Mushroom Cloud Ad").

At an official Village meeting held to discuss the moratorium, participants openly complained of the "ever increasing number of applications for Yeshivas, home houses of worship" and "small homes of worship growing" as the "biggest problem"; one community member stated "we have to decide who was are as a village" and "between the [unclear] houses of worship and everything like that, I'm going to bang my head against the wall." *See* Declaration of Keisha Russell ¶ 2 & Ex. A ("Village Meeting Video"). Its majority on the Board of Trustees preserved after the 2017 elections, the Preserve Airmont administration extended the moratorium three times, to late 2018, *see* Resolutions 17-3048, 18-4025, 18-4095, attached as Ex. 6 to Cha-Kim Decl., despite the fact that by its own terms it was supposed to have lasted only six months, with only one extension, *see* Local Law No. 1, § 2.

### 4. The 2018 Zoning Code

When the moratorium finally ended, the Preserve Airmont administration enacted an entirely reworked zoning code in 2018 ("2018 Code"). *See* 2018 Code, excerpts attached as Ex. 7 to Cha-Kim Decl. Unlike in the prior 1997 and 2007 Codes, which, consistent with the terms of the *Airmont I* judgment, provided for the RPW as a recognized land-use category, the 2018 Code removed it altogether: the definition of RPW mandated by a judgment of this Court was stricken from the code, as were the express inclusion of the RPW as a use "permitted by right" in each of the residential districts recognized by the code. *Compare* 2007 Code §§ 210-14(A)(6), 210-

15(A)(6), 210-16(A)(6), 210-17(A)(6), 210-18(A)(6), 210-174 *with* 2018 Code §§ 210-14(A),

210-15(A), 210-16(A), 210-17(A), 210-18(A), 210-174.[4]

Instead, the 2018 Code created a new category of "residential places of assembly"

("RPA"), which are "permitted by special permit" only. 2018 Code § 210-12.1(A); *see also id*.

§§ 210-14(B)(24), 210-15(B)(24), 210-16(B)(24), 210-17(B)(24), 210-18(B)(24) (listing RPA

under "[s]pecial permit uses by Planning Board," not "[u]ses permitted by right," as previously).

The RPA is defined as "an accessory use where organizations or loose-affiliations of likeminded

people conduct civic, social or religious activities more than three (3) times per month." *Id*.

§ 210-12.1(B)(2). The 2018 Code imposes a number of categorical restrictions on the use of a

property deemed to be an RPA, such as a strict cap of the space that can be used for an accessory

use like prayer to "40% of the gross floor area of a residence," including "bathrooms, meeting

rooms, lobby areas and/or other accessory facilities," *id*. § 210-12.1(B)(1); a ban on any "public

baths, schools, and classrooms" as accessory uses, *id*. § 210-12.1(B)(5); a prohibition on "non-

members" "utiliz[ing]" any "space within the RPW," *id*. § 210-12.1(B)(6); and restriction of

"[u]se of any outdoor areas of the property" for anything other than "passive recreation use, a

small jungle gym for children, benches, and picnic tables," *id*. § 210-12.1(B)(7).

The 2018 Code's RPA rubric eliminated the expedited site review of smaller RPWs

under the 2007 Code and now subjects all home synagogue applications to the "site development

plan review" process and Chapter 164. *Compare id*. § 210-12.1(B) *with* 2007 Code § 210-

12.1(B). The site development plan review process itself was also altered: unlike the 2007 Code,

all applicants must participate in the "informal review" procedure before the CDRC, which now

---

[4] The only reference to RPWs that remains is in the same subsection found in the 2007 Code providing that applications for RPWs be given priority in scheduling agenda, *see* 2018 Code § 210-12.1(B)(15), a provision which, given the scrubbing of the RPWs entirely from the 2018 Code, lacks any effect.

has the discretion to "opine as to whether an application" merits being placed before the Planning Board. 2018 Code § 210-74(A)(1). No grandfathering provision was included for any pending applications. *See id*. § 210-12.1(B).

### 5. Effect on Orthodox Jewish Residents

Assembling a minimum of ten men for group prayer and refraining from driving on the Sabbath and holidays are vital elements of Orthodox Judaism, meaning access to RPWs is essential for its adherents, as is the ability to construct sukkahs outside once a year around the holiest day of the Jewish calendar. *See* Affidavit of Abraham Horowitz ¶¶ 3, 5; Affidavit of Moishe Berger ¶¶ 3, 5. Rabbis in particular must have facilities to welcome their own congregants as well as any other individual seeking to worship, including ritual baths that can accommodate a small number of adherents. *See* Horowitz Aff. ¶ 4; Berger Aff. ¶ 4. The growing Hasidic community in Airmont has contributed to the demand for such residentially co-located places of worship. *See* Horowitz Aff. ¶ 6; Berger Aff. ¶ 6.

Under Airmont's permitting regime over the past number of years, Orthodox Jewish residents have been unable to obtain the necessary permits to maintain RPWs to meet this need. For instance, Rabbi Abraham Horowitz of Congregation Khal Boston has been attempting to gain a permit for an 850 square foot prayer space for about 15 congregants without success since 2012: appearing before the CDRC, his proposal was repeatedly delayed by different findings in successive meetings, including for supposed non-compliance with parking requirements, problems with landscaping choices such as the type of tree to be planted, and Village demands to see his intended interior seating layout. *See* Horowitz Aff. ¶¶ 8-12. Even after the Planning Board finally approved his application in August 2015, the Village has made him return to the CDRC, and his proposal remains stalled. *Id*. ¶¶ 13-20. Similarly, Rabbi Moishe Berger has been

unsuccessfully seeking a permit for proposals to operate a RPW since 2015: he appeared before repeated sessions of the CDRC that raised a succession of problems, including supposed ADA requirements, before being finally allowed to proceed to the Planning Board in 2017, only to be abruptly told that his RPW was categorically not permitted—on the supposed basis of a cap on the size of RPWs permitted that is not found in the Code and the incorrect premise that his lot is undersized for his zone. *See* Berger Aff. ¶¶ 7-15. Each congregation has spent over $20,000 in costs related to the CDRC process. Horowitz Aff. ¶ 21; Berger Aff. ¶ 17.

<u>**ARGUMENT**</u>

### I.    Applicable Preliminary Injunction Standard

The factors courts typically consider in weighing a preliminary injunctions are well known: a showing of likelihood of success and irreparable harm, and whether "the injunction is in the public interest" and supported by the "balance of equities." *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (citation omitted). It is a "well-established rule," however, that where the preliminary injunction is sought under the terms of a remedial statute enacted "to make unlawful specific conduct," a court may enter such "statutorily authorized injunctive relief" upon "show[ing of] a violation of the statute" alone. *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 120–21 (2d Cir. 2010) (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)). That is so because "the passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *FCC v. Waterbury Hispanic Comm's, Inc.*, 109 F. Supp. 2d 80, 84 (D. Conn. 1999) (citation omitted); *see also United States v. Diapulse Corp.*, 457 F.2d 25, 28 (2d Cir. 1972). As such, the Government "need only demonstrate that there is reasonable cause to believe a statutory violation will occur." *See Golden Feather*, 597 F.3d at 120 (citation omitted);

*U.S. v. Milner*, 583 F.3d 1174, 1194 (9th Cir. 2009) (irreparable injury and balancing of interests not required).[5]

## II.    RLUIPA Requires Entry of a Preliminary Injunction

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens," *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005), by "provid[ing] greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (discussing RLUIPA and sister statute). To that end, a local government may not implement or impose any land use regulation that, *inter alia*, imposes a "substantial burden on the religious exercise of a person, including a religious assembly or institution," 42 U.S.C. § 2000cc(a)(1), or discriminates "against any assembly or institution on the basis of religion or religious denomination," *id*. § 2000cc(b)(2).

Congress has specifically empowered the Attorney General to "bring an action for injunctive or declaratory relief to enforce compliance" with these provisions. *Id*. § 2000cc-2(f). Entry of a preliminary injunction is supported independently under both, as described in turn.

### A.    The Government Is Likely To Succeed on the Merits

#### 1.    Airmont Has Substantially Burdened Residents' Religious Exercise

To establish a "substantial burden" claim, a plaintiff must show that the "implementation of a 'land use regulation' placed a 'substantial burden' on the plaintiff's 'religious exercise.' The burden then shifts to the defendant to demonstrate that it 'acted in furtherance of a compelling governmental interest and that its action is the least restrictive means of furthering that interest.'" *Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic Dist. Com'n*, 768 F.3d 183, 192 (2d Cir. 2014) (citations omitted). "A substantial burden is one that directly coerces the

---

[5] As explained below*, see infra* n.8, in light of the First Amendment rights and history of violations at issue here, the Government is also able to satisfy the traditional multi-factor standard applied in non-statutory injunction cases.

religious institution to change its behavior." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 218–19 (2d Cir. 2012) (citation and quotation marks omitted); *see also Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (a substantial burden "imped[es] . . . religious exercise"). This provision protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), and applies wherever the substantial burden arises from a government's "formal or informal procedures" for making "individualized assessments" of a property's uses, *id*. § 2000cc(a)(2)(C).

At the threshold, there is no dispute that the Airmont Orthodox Jewish community's efforts to modify or otherwise use their homes to worship as required by their faith constitute a protected religious exercise. *See Westchester Day*, 504 F.3d at 347 ("using, building, or converting real property for religious exercise purposes" satisfies statute, and term "is to be construed broadly and to the maximum extent permitted"). Nor is there any serious question that the conduct at issue, the Village's passage of a land-use permitting system and adjudication of resident applications thereunder, satisfies the "individualized assessments" requirement. *See Chabad Lubavitch*, 768 F.3d at 193 ("predicate is satisfied when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use," which "almost all . . . land use regimes will satisfy"); *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 499 (S.D.N.Y. 2010) ("[C]ourts have repeatedly found that special use permit and variance applications depend on individualized assessments.") (citations omitted).

### a. The Village Categorically Restricts Certain Religious Exercise and Imposes RPWs to Arbitrary Delay, Uncertainty, and Expense

The record demonstrates that Airmont has substantially burdened Orthodox Jewish residents' right to religious practice at home in a number of ways, violating the principles of the *Airmont I* judgment by hindering religious assembly and eviscerating the principle of by-right

use of RPWs. To begin, a number of provisions in the 2018 Code on their face coerce Orthodox Jewish residents into abstaining from, or otherwise restrict, important aspects of their faith:

1. The tenets of Orthodox Judaism require that adherents build sukkahs on open ground on their property, *see* Berger Aff. ¶ 5; Horowitz Aff. ¶ 5; to do so now violates the Village's restriction against using "any outdoor areas" for anything other than "passive recreation" and maintaining "a small jungle gym for children, benches, and picnic tables." 2018 Code § 210-12.1(B)(7).

2. Orthodox Jewish rabbis must maintain mikvahs, within their homes, which are open to ceremonial use by a small number at a time from outside the household, *see* Berger Aff. ¶ 4; Horowitz Aff. ¶ 4; they cannot do so in light of Airmont's express ban on any kind of "public" bath as an accessory use. 2018 Code § 210-12.1(B)(5).

3. Like many religions, Orthodox Judaism emphasizes welcoming those outside the congregation for prayer, *see* Berger Aff. ¶ 4; Horowitz Aff. ¶ 4; Airmont's restriction on "non-members" of a specific RPW utilizing the space makes it unlawful for rabbis to pray in their own homes with a neighbor who may have a different rabbi, or for that matter non-Orthodox Jews or guests of different faiths, *id.* § 210-12.1(B)(6).[6]

4. In addition, the Village has placed an arbitrary 40% cap on the amount of floor space in his or her home that a resident can devote to religious worship. *Id.* § 210-2.1(B)(1).

A zoning scheme that conditions the use of property by a religious institution in such manners that create an "inability to construct an adequate facility" for the religious exercise required constitutes a substantial burden under RLUIPA. *See Fortress Bible*, 694 F.3d at 219 (finding substantial burden where restrictions capped "space to accommodate" current and new co-religionists and prevented discrete practices like baptisms and live prayer); *Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 991 (9th Cir. 2006) (denials of permit constituted substantial burden because they "lessened the prospect of [Sikh worshippers] being able to construct a temple" on residential lot).

In addition to these restrictions, the 2018 Code expands the use of an RPW-permitting process that Airmont has been implementing to frustrate Hasidic applicants, so that instead of

---

[6] This provision implicates both the Free Exercise Clause and the "right to free association . . . implicit in the First Amendment." *Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 858 (2d Cir. 1996) (citations omitted).

speedy consideration for issuance of permits they are entitled to by right, these residents have been subjected to adjudicative "delay, uncertainty, and expense." *Westchester Day School*, 504 F.3d at 349, 350 (citations omitted). In 2018, Airmont struck RPWs as a recognized, of-right land use, systematically scrubbing RPW from the list of "uses permitted as of right" for each of the code's residential zones, and eliminating the "expedited" review process that had been in place for RPWs for 1,400 square feet and under. *Compare* 2007 Code §§ 210-12.1, 210.14 – 210.18, 210-174 *with* 2018 Code §§ 210-12.1, 210.14 – 210.18, 210-174. These alterations and amendments not only violated the direct terms of the *Airmont I* judgment, from which the Village has never sought nor been granted relief, *see Vill. of Airmont*, 925 F. Supp. at 161 ("[RPWs] will be permitted by right on any day in all residential zones"), they were accompanied by a significant increase in the scrutiny Airmont imposed upon RPW proposals. For the first time, the code now subjects *all* proposed home worship spaces, no matter how small in scope and impact, to a "special permit use" review process that is dominated by the CDRC—a body that has been given increased power to single-handedly determine whether and how an application can be considered by the Planning Board, all on the basis of undefined substantive criteria. *See* 2018 Code §§ 210-12.1(B), 210-74.[7]

The Second Circuit has made clear that RLUIPA's substantial burden provision is implicated by such zoning schemes that purport to "'delegate[ ] essentially standardless discretion to nonprofessionals operating without procedural safeguards.'" *Chabad Lubavitch*, 768 F.3d at 193 (quoting *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New*

---

[7] To the extent that Airmont asserts that the United States previously endorsed the provisions challenged here, that contention is groundless. As explained at length above, *see supra* at 5-7, the Government only agreed to certain proposed review procedures as a "test case" in 2000, specifically reserving judgment as to whether the code could be permanently changed. In any event, the "test case" proposal, most of which Airmont later unilaterally adopted into its 2007 code without input from the Government, contained none of the provisions that underlie the Government's claims, which were only added by the 2018 Code. Moreover, as the code existed as of the time of the test case, the CDRC had a much more limited function, without any of the increased powers Airmont gave it in 2007 and 2018.

*Berlin*, 396 F.3d 895, 901 (7th Cir. 2005) (ordering district court to grant plaintiff relief from city's Planning Commission and other officials)). That is particularly so where, as here, the adjudicator's "willingness to consider [a] proposal is disingenuous," or decision-making is "arbitrary, capricious, unlawful, or taken in bad faith," effectively leading to "conditional denial" of applications. *Fortress Bible*, 694 F.3d at 219. Here, experience has shown that the CDRC has delayed even minor-scale RPW proposals by arbitrarily imposing facially unjustified requirements, including: (1) refusing to advance applications by insisting on expanded parking capacity plainly contrary to the code, *compare* 2007 Code § 210-12.1(B)(3) (one spot required per 200 square feet of RPW space) *with* CDRC Minutes, attached as Ex. 8 to Cha-Kim Decl., May 7, 2013 (demanding 21 spaces for 850 square-foot proposal) and CDRC Minutes, Mar. 8, 2016 (11 spaces for 900 square-foot plan); (2) holding up RPWs based on compliance issues with the Americans with Disabilities Act, *see* CDRC Minutes, Mar. 11, 2014, Jan. 12, 2016, when the law is clear that places of worship are exempt, *see* 42 U.S.C. § 12187; (3) demanding additional materials relating to issues like landscaping and lighting, *see* CDRC Minutes, Nov. 12, 2013, Mar. 8, 2016, that are not relevant topics for review, *see* 2007 Code § 210-12.1(B)(5); *see also* Russell Decl. ¶ 16; and, (4) insisting that applicants provide irrelevant details, such as precise intentions for interior layout and the placement of chairs within rooms, *see* CDRC Minutes, May 7, 2013, Mar. 8, 2016, that have no objective relevance for the type and scale of review involved, *see* Russell Decl. ¶ 16.

Neither Rabbis Horowitz nor Berger has obtained approval to date for their RPWs, despite having spent tens of thousands of dollars on costs imposed by the constantly shifting requirements of the review process. *See* Horowitz Aff. ¶ 21; Berger Aff. ¶ 17. An RPW of the modest size proposed by Rabbi Horowitz was required to have been permitted on an expedited

basis within 62 days; he first applied in 2012. *See* 2007 Code § 210-12.1(B)(7),(9). Rabbi Berger, after duly working with the CDRC over several rounds of review on an updated proposal, was finally allowed to proceed to the Planning Board, only to be told that his RPW was categorically prohibited because his lot was undersized for its zone, *see* Dec. 27, 2017, Ltr., attached as Ex. 9 to Cha-Kim Decl., reasoning that the CDRC had never previously raised and was in any event demonstrably false, *compare* Berger Aff. ¶ 2 (attesting that he owns a 36,672 square foot lot in R-35 zone) *with* 2007 Code § 210-16 (minimum 35,000 square feet for R-35 zone).

"[A] substantial burden [i]s demonstrated in circumstances" such as these, "where the decision maker cannot justify the challenged ruling and where repeated legal errors by . . . officials cast[ ] doubt on their good faith," including because the officials have "inconsistently applied specific policies and disregarded relevant findings without explanation." *Westchester Day School*, 504 F.3d at 350–51 (quoting *Sts. Constantine and Helen*, 396 F.3d at 899–901; *Guru Nanak*, 456 F.3d at 989–91 (internal quotation marks omitted)); *see also Fortress Bible*, 694 F.3d at 219 (substantial burden, and inference of discriminatory state of mine, arises "when the town's actions are arbitrary, capricious, unlawful, or taken in bad faith"); *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 548–49 (S.D.N.Y. 2006) ("context" of applicants attempting to address zoning board's concerns yet still facing denial relevant to substantial burden analysis). After already wielding the CDRC review process in this arbitrary manner even prior to 2018, as noted above, the Village has now expanded this scheme under the 2018 Code by subjecting every RPW proposal to its mandatory reach. Because this zoning scheme is being used to impose considerable delay, uncertainty, and expense on applications for permits in contravention of the terms of a prior injunction entered by this Court, "thereby

impeding . . . religious exercise," *Westchester Day School*, 504 F.3d at 349, it is a substantial burden to religious exercise that must be enjoined.

      **b.**    **The Challenged Provisions and Conduct Are Not the Least Restrictive Means To Further Legitimate Government Interests**

To defeat the Government's substantial burden claim, Airmont bears the burden "to prove it acted in furtherance of a compelling governmental interest and that its action is the least restrictive means of furthering that interest." *Westchester Day School*, 504 F.3d at 353. Strict scrutiny applies where a defendant "substantially burden[s] the exercise of sincerely held religious beliefs," and to survive review, conduct "restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). Airmont cannot satisfy this exacting standard.

"While upholding zoning laws may be considered a compelling interest, the Village must demonstrate that the enforcement in those zoning laws is compelling in this particular instance, not in the general scheme of things." *Bikur Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267, 291 (S.D.N.Y. 2009) (citation omitted). Airmont cannot do so with respect to the "particular use[s] at issue" under the 2018 Code's finely-targeted restrictions. *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 432 (2006)). An arbitrary cap on the floor space that can be used for religious use within a structure that would otherwise be permissible under lot size requirements does not in itself advance any safety concerns, as it has no bearing on the number of individuals intending to make use of the property. Nor does the ban on "non-members," by which Airmont seeks to police *who* is present in residents' homes, not how many. And there is no particularized interest of the "highest order" that would support the Village's micromanagement of residents' private property to prevent the once-a-year erection of

a ritual hut or the presence of a small bath. *See id.* ("only the gravest abuses, endangering paramount interests, give occasion for permissible limitation") (citation omitted); *see generally Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 418 (S.D.N.Y. 2015) (collecting cases holding that aesthetics, traffic safety, and community character are normally not compelling interests). Moreover, the Village's actions in delaying and refusing to advance individual applications cannot have been in furtherance of legitimate compelling interests given its arbitrary reliance on the CDRC's repeatedly outright erroneous findings. *Westchester Day School*, 504 F.3d at 353 (no "compelling governmental interest" where "stated reasons for denying the application were not substantiated by evidence in the record").

Even assuming the existence of a compelling state interest, however, Airmont cannot show that it imposed the least restrictive means of regulation available, which it must do by adducing "evidence . . . in the form of data, studies, or reports indicating . . . that it fully and adequately considered any alternatives." *Redeemed Christian Church of God (Victory Temple) v. Prince George's County*, -- F.3d --, 2020 WL 5407808, at *12 (D. Md. Sept. 9, 2020). The one-size-fits-all floor space cap, prohibition on congregation-shared mikvahs and sukkahs, and ban on "non-members" are all categorical restrictions that, to the extent they ever raise legitimate concerns within specific RPWs, ignores the obvious alternative of approval "subject to conditions" as necessary on a case-by-case basis. *Westchester Day School*, 504 F.3d at 353; *see also Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 559 (4th Cir. 2013) (zoning interest can be "served by less restrictive means, like . . . an individualized review process").

Indeed, an individualized review process (implemented as it was in arbitrary fashion) was in place under the previous version of the code, which considered the same regulatory concerns

during the case-by-case evaluations of RPWs. What is more, Airmont cannot now plausibly

claim that it has no less restrictive alternatives than the 2018 Code available to it to regulate

RPWs—because the Village had precisely that for the more than two decades preceding the

amendments. The 1997 Code allowed RPWs by right in all residential districts; the 2007 Code

allowed review of RPWs under either the expedited site review process (for RPWs 1,400 square

feet and under) or the site development plan review (for those over 1,400 square feet), the latter

of which included only the option for an informal discussion with the CDRC prior to formal

application to the Planning Board. The use of these prior iterations of RPW regulation

schemes—which are in line with what other municipalities commonly employ, *see* Russell Decl.

¶¶ 10-11—demonstrate on their face that the 2018 Code, which now subjects all RPWs, even

those with the smallest scale, to the arbitrary review of the CDRC, is not the least restrictive

means feasible. *See Tartikov*, 138 F. Supp. 3d at 421 (challenged law not narrowly tailored if

"Village law already provides several layers of regulation to protect the interests at issue,"

including an individualized process that can address "additional concerns and safeguards").

### 2. Airmont Discriminates on the Basis of Religion

A RLUIPA discrimination claim may be established on the basis of: "(1) a facially

discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent

and applied with a discriminatory effect (*i.e.*, a "gerrymandered" law); [or] (3) a facially neutral

law that is enforced in a discriminatory manner." *Chabad Lubavitch*, 768 F.3d at 199 (citing

*Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). Courts look for "circumstantial and

direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metropolitan

Housing Development Corp.*, 429 U.S. 252, 266 (1977). Such evidence is drawn from "the series

of events leading up to a land use decision [and] context in which the decision was made,"

"statements made by the decisionmaking body and community members," "whether a discriminatory impact was foreseeable," "whether the decision or decisionmaking process departed from established norms," and "whether less discriminatory avenues were available." *Chabad Lubavitch*, 768 F.3d at 199 (citations omitted). Even assuming that the 2018 Code is facially neutral, the Government is likely to prevail on its discrimination claims.

First, the 2018 Zone's creation occurred only as a result of the election of Preserve Airmont, which won office on an explicit platform of supporting a moratorium on all development in order to rework the existing code, to avoid becoming "the next town of Ramapo." *See* 2017 Ad. As it was at Airmont's creation, invoking Ramapo-like development remains an unsubtle rallying cry for anti-Hasidic animus, understood across Rockland County and wielded specifically in Airmont to attack candidates deemed to support the Orthodox Jewish community. *See* Invasion Ad; Mushroom Cloud Ad. Dispelling any doubt of this connection, statements made during at least one public Village hearing about the moratorium openly complained of the "ever increasing number of applications for Yeshivas, home houses of worship," the "biggest problem" of "small homes of worship growing," and the need "to decide who was are as a village" as "between the [unclear] houses of worship and everything like that, I'm going to bang my head against the wall." *See* Village Meeting Video. This context amply supports the conclusion that Airmont enacted the 2018 Code motivated by a desire to target the Hasidic minority, and given that unambiguously expressed purpose, the resulting "discriminatory impact was foreseeable." *Chabad Lubavitch*, 768 F.3d at 199.

Moreover, the record demonstrates that Airmont's actions are suspect because they "departed from established norms." *Id*. As the Government's land use expert, who has participated in the drafting or revision of 60 zoning codes in New York and across the country,

Russell Decl. ¶ 3, explains: the 2018 Code's "highly unusual" restrictions on "non-members" and many common outdoor uses depart from ordinary zoning practices, *id*. ¶ 13; imposing "special permit use" requirements on all RPWs regardless of size is atypical, as common practice by municipalities is to regulate religious uses, including within residential areas, as either an entirely "of right" use or an "of right" use subject to a streamlined permitting process, *id*. ¶¶ 8-10 (explaining codes do not apply special permit use to small-scale residential religious accessory use); while some site plan review of religious uses is not out of the ordinary in the zoning process, it is limited to public health and safety concerns and unrelated issues like landscaping and design are not scrutinized, *id*. ¶ 12; imposing site development plan review criteria, with procedural and substantive requirements for commercial and other projects with significant impacts, is not ordinary practice for the types of RPWs implicated, *id*. ¶ 14; and the use of CDRCs similarly is usually reserved by the localities that have these bodies to streamline resolution of complex technical issues in such larger-scale projects, not to demand information such as choice of trees and interior layout from applicants, *id*. ¶ 15-16. In other words, Airmont's revised zoning scheme implemented conspicuously irregular and disproportionately burdensome requirements—through the rubric of a new zoning category of "RPA" that appears to address no other foreseeable use than home worship spaces, *id*. ¶ 7—in ways that are objectively out of step with its own past practices and those of other municipalities.

Taken together, along with the fact that as already discussed, a number of "less discriminatory avenues" were available in the form of less restrictive measures Airmont could have taken (and in the past did take), all of the above factors lead to an inescapable conclusion: the Village has implemented Preserve Airmont's stated mission to enforce a moratorium and

rework the Code to thereby single out and discriminate against Orthodox Jewish religious land use.[8]

## **CONCLUSION**

For the reasons stated above, the Court should enter a preliminary injunction against the Village of Airmont pending final resolution of this action. Specifically, the Court should (1) preliminarily enjoin Defendant from enforcing any provision of the 2018 Code to adjudicate any zoning application or proposal related to Residential Places of Worship, as that term is defined by *Airmont I* judgment; (2) order Defendant to restore "Residential Place of Worship" (a) as a separately defined category under § 210-174 of the Zoning Code pursuant to the definition required by the *Airmont I* judgment, and (b) as an enumerated "use permitted by right" under §§ 210-14(A), 210-15(A), 210-16(A), 210-17(A), 210-18(A) of the Zoning Code.[9]

---

[8] Although it need not establish the remaining factors of the traditional preliminary-injunction inquiry given that the relief here is sought under the dictates of RLUIPA, the Government has also satisfied these elements. To start, "[r]eligious adherents are not required to establish irreparable harm . . . because a presumption of irreparable injury flows from a violation of constitutional rights." *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (citation and alterations omitted). As to the public interest and balancing of hardships, there is similarly little question that this final factor weighs decidedly in the Government's favor. *See New York v. Dep't of Homeland Sec.*, 969 F.3d at 59 (two factors merge where government is a party). "[S]ecuring First Amendment rights is in the public interest," *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), and "[t]his principle applies equally to injunctions protecting RLUIPA rights because, as discussed, RLUIPA enforces the First Amendment and must be construed broadly," *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012). Balanced against this vital public interest, the Village cannot identify "any hardship that would outweigh the continuing violation of [a religious group's] federal right to exercise its religion on [its] Property." *Christian Fellowship Centers*, 377 F. Supp. 3d 146, 166 (N.D.N.Y. 2019). Particularly given Airmont's history of discrimination, the weighing of equities favor entry of a preliminary injunction. *See Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) ("past misconduct is highly suggestive of the likelihood of future violations").

[9] Should this injunction be entered, residents currently injured by the Village, including the plaintiffs in the related matter of *Congregation of Ridnik v. Vill. of Airmont*, No. 18 Civ. 11533 (NSR), may well seek to make applications for relief as appropriate under the Code as enjoined.

Dated: New York, New York
       February 12, 2021

                               Respectfully submitted,

                               AUDREY STRAUSS
                               United States Attorney for the
                               Southern District of New York
                               *Counsel for the United States*

By:    /s/ Stephen Cha-Kim
                               STEPHEN CHA-KIM
                               Assistant United States Attorney
                               86 Chambers Street, Third Floor
                               New York, New York 10007
                               Telephone: (212) 637-2768
                               Facsimile: (212) 637-2702
                               stephen.cha-kim@usdoj.gov